# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| EDWARD MCLAIN, | : | Case No. 3:18-cv-257 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Edward Mclain brings this case challenging the Social Security Administration's denial of his application for period of disability and Disability Insurance Benefits.  He applied for benefits on October 4, 2015, asserting that he could no longer work a substantial paid job.  After a hearing, Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II. <u>Background</u>

Plaintiff asserts that he has been under a "disability" since September 18, 2015. He was thirty-four years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). He has at least a high school education. *See id.* § 404.1564(b)(4).

### A. **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Motta that his blood disorder—hypogammaglobinemia—affects his ability to work. (Doc. #6, *PageID* #92). He provided a cogent explanation of the disorder:

> It affects about 1 in 25,000 people and … there's two different types. There's specific and non-specific. I have non-specific which means that all of my immunoglobulins are impacted by the disease. Immunoglobulins are a type of blood cell that fights off infections. [W]hen I have blood work done, mine do not register so it's general hypogammaglobulinemia. It causes frequent infections mostly respiratory and bronchial infections as well as digestive tract infections and stomach infections. I spend quite a portion of my life being incredibly ill to the point where I can't even get out of bed where I have to … have my food prepared and brought to me if I could eat. I can't drive when … I'm very ill so I rely very heavily on my mother as a caregiver at this time.

*Id.* at 92-93.

For over three years, Plaintiff has had gamma-globulin infusion therapy every four weeks. *Id.* at 93. "Essentially what they do is over a four-hour to five-hour period, they

infuse my blood with gamma globulins and what that does is that helps create an artificial immune system in place of the immunoglobulins that my body would normally produce to help fight off infections." *Id.* After a transfusion, he is usually nauseated for the next twenty-four hours. *Id.* at 100. He has anti-nausea medicine that sometimes helps. *Id.* If it is really bad during the infusion, they will give him an anti-nausea injection. *Id.* He also gets a headache and his arm hurts for the rest of the day. *Id.*

Although the infusions help, Plaintiff still gets infections "quite often"—every four to six weeks. *Id.* at 93, 105. They are sometimes gastrointestinal infections but are more often respiratory-related infections such as acute bronchitis or a sinus, ear, or upper-respiratory infection. *Id.* at 105. When he has a respiratory-related infection, he generally has a difficult time breathing. *Id.* He also has a hard time focusing because he is so sick. *Id.* Most of the time, he is in bed. *Id.* "[A] lot of times I can't get out of bed. If I do attempt to get out of bed, … the room will kind of spin." *Id.*

Plaintiff has asthma and uses inhalers. *Id.* at 94. At the time of the hearing, he still smoked but was down to three or four cigarettes a day. *Id.* at 95. He has some other health problems for which he takes medication, including simvastatin for high cholesterol and lisinopril for high blood pressure. *Id.* He also takes medication to help digest food. *Id.* at 94.

Plaintiff has a history of seizures. He takes medication, Keppra. *Id.* at 95. His neurologist and psychiatrist diagnosed stress seizures. *Id.* at 102. He described what sort of events raise his stress to that level:

> [T]he most recent experience was on June 5 when my mother quit her job over the phone and told me that she was moving to Tennessee. She was originally going to move at the end of this month which would have left me with six months of a lease to pay with no job and no income to support myself. I had three seizures back to back. They lasted maybe 45 seconds to a minute/minute and a half. During the course of one of the seizures, a bookcase did fall over on me. All the books fell on me. Everything else in the bookcase fell on me. Really, the frequency of the seizures depends on how stressed I get. I keep track as per instructions by my neurologist. I keep a seizure log to show when I have the seizures, what happened during the seizure, whether or not I went to the hospital or the ER or for how long afterwards I was postictal.

*Id.*

Plaintiff struggles with depression and anxiety. He has panic attacks "very frequently." *Id.* at 100. They last anywhere from ten to forty-five minutes. *Id.* at 101. When asked what they feel like, Plaintiff responded, "How I feel right now. I sweat, I get real bad dry mouth, … I can't communicate effectively, sometimes I will feel like … I can't breathe and will have to either breathe into a bag or put my head between my knees and try to breathe that way, I'm unable to focus on anything at all." *Id.* at 100-01.

Additionally, Plaintiff has crying spells one or two times a week. *Id.* at 101. They always last at least twenty to thirty minutes and sometimes more. *Id.* He has a hard time getting out of bed ten to fifteen days a month. *Id.*

He began treatment with his psychiatrist, Dr. Barclay, and his therapist, Christine Farens, in 2012. *Id.* at 107. Dr. Barclay has spent five years fine-tuning Plaintiff's medications. *Id.* at 94. Plaintiff takes two medications for depression, two for anxiety, and one for sleeping. *Id.* The medications "keep things at bay." *Id.* at 95. However,

when he has high anxiety, his medications do not help. *Id*. Likewise, there are times he is depressed or cannot sleep. *Id*. For example, there are some days when he is awake for twenty-four hours ruminating or feeling depressed and anxious. *Id*. After he spends that much time awake, if the issue causing anxiety is resolved, he is able to get some sleep. *Id*. at 98-99. Unfortunately, he still cannot sleep for eight hours at one time. *Id*. at 99. Instead, he sleeps for about an hour, gets up for a few hours, and then goes back to sleep for another hour. *Id*. If the issue is not resolved, he is not able to sleep during the day and, instead, he watches TV, chain smokes, and sometimes paces. *Id*. When he has not slept, he has a hard time concentrating and forming cohesive thoughts. *Id*.

Plaintiff lives in an apartment with his mother. *Id*. at 86-87. However, Plaintiff's mother planned to move to Tennessee in August 2017. *Id*. at 93. Plaintiff drives about once a week. *Id*. at 87. He goes to the grocery store once a month. *Id*. at 97. Plaintiff's only contact with his friends is through Facebook. *Id*. at 98. If he is not doing schoolwork and is not sick, he watches TV. *Id*.

Plaintiff completed his bachelor's degree and began an online master's program in April 2015. *Id*. at 87. He anticipated graduating in August 2017. *Id*. at 87-88. It took him two and a half years to complete the program because he was only able to take one class per semester. *Id*. He estimated that, on average, he spent six to eight hours per week on his online studies. *Id*. at 95-96. He had a disability accommodation that allowed him 150-percent extra time for tests and an additional 24 hours to turn in assignments. *Id*. at 106. His professors usually allowed him additional time—up to a full week to turn in late assignments. *Id*.

In the past, Plaintiff worked as a manager at Journey Shoes, Pacific Sunwear, and Family Video and as an assistant manager at Super Pets. *Id.* at 89. He also worked at the call center for Victoria Secret direct catalog and as a student cashier at Sinclair Community College. *Id.* at 89-90. He worked in a call center for GMB Servicing Company/Synchrony Financial for three and a half years. *Id.* at 90-91. Plaintiff resigned in lieu of being fired due to attendance issues. *Id.* at 91. He attempted to work part-time at JP Morgan Chase but had the same attendance issues and resigned. *Id.*

Plaintiff was looking for jobs but stopped in February 2017 "when [he] realized … there was just no possible way for [him] to hold a job. No one was willing to accommodate the time that [he] needed to have off." *Id.* at 96.

### B. Medical Opinions

#### i. *James Barclay, M.D.*

In November 2015, Dr. Barclay, Plaintiff's treating psychiatrist, diagnosed panic disorder with agoraphobia. *Id.* at 1387. He explained that Plaintiff has panic attacks that "come out of the blue without warning, and involve physical symptoms which make it impossible for him at times to carry on with work." *Id.* When he has to work with the public, certain triggers can bring on a panic attack. *Id.* For example, Plaintiff fears that if he brings up his physical symptoms at work, it will trigger a panic attack and he will have to leave work. *Id.* He is afraid this will result in a reprimand or cause other issues. *Id.*

Mr. Barclay's office assistant, Sheri Kaldor-McConaughy, provided a statement regarding Plaintiff's psychiatric treatment. She noted that he sees Dr. Barclay on a monthly to bimonthly basis for medication management and psychotherapy. *Id.* at 1967.

Plaintiff also sees a therapist, Christine Ferens, on a monthly basis for psychotherapy. *Id.* at 1968.

Plaintiff was being treated for major depressive disorder, panic disorder with agoraphobia, insomnia, and borderline-personality disorder. *Id.* at 1967. His treatment included four medications—fluvoxamine, quetiapine, alprazolam, and estazolam. *Id.* Ms. Kaldor-McConaughy concluded,

> Our providers cannot state that Mr. McLain is permanently disabled for psychiatric reasons. He is still very young. However, currently it has become apparent that due to increased anxiety, depression, and stress this patient is having a very hard time with overcoming his diagnosis. At this current time, he is not fully well enough to be able to work on a steady basis. It is believed that the prognosis is good if the patient continues psychotherapy and medication which is prescribed by Dr. Barclay and also additional therapy with his therapist Christine Ferens.

*Id.*

### ii. Satheesh Kathula, M.D.

Plaintiff's treating hematologist, Dr. Kathula, indicated in February 2017 that Plaintiff has hypogammaglobulinemia with frequent infections. *Id.* at 1964-65. "These[] infections can occur monthly, every 4 – 6 weeks. The flare up of these infections can last up to 1 – 2 weeks." *Id.* at 1065.

### iii. Courtney Zeune, Psy.D., & Paul Tangeman, Ph.D.

Dr. Zeune reviewed Plaintiff's records in November 2015 and found he has four severe impairments—hemolytic anemias, affective disorders, anxiety disorders, and personality disorders. *Id.* at 123. He has a moderate restriction in activities of daily

living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* at 124. Dr. Zeune opined that Plaintiff "is able to perform simple and some multi-step tasks in a setting with flexible pace and productions requirements." *Id.* at 128. Because he has pressured speech at times, displays anxiety at times, and does not leave the house for fear of crowds, "He should only work in an environment without exposure to the public, and only infrequent superficial contact with supervisors and coworkers." *Id.* He is able to adapt to a routine work setting. *Id.* at 129.

In January 2016, Dr. Tangeman reviewed Plaintiff's records and affirmed Dr. Zeune's assessment. *Id.* at 133-48.

## III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits.  She did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  She reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since September 18, 2015.

Step 2:    He has the severe impairments of hypogammaglobulinemia, asthma, stress-related seizures, obesity, depressive/mood disorder, anxiety disorder (obsessive-compulsive disorder and panic disorder with agoraphobia), insomnia, and personality disorder.

Step 3:    He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; (2) sitting, standing, and walking six hours each during an 8-hour-hour workday; (3) occasional postural activities, such as balancing, stooping, kneeling, crouching, crawling, or climbing ramps and/or stairs; (4) no climbing ladders, ropes, or scaffolds; (5) no exposure to hazards, such as dangerous machinery or working at unprotected heights, and no driving as part of job duties; (6) no exposure to vibration; (7) no concentrated exposure to extremes of heat, cold, wetness, humidity, or dust, fumes, odors, gases, or poorly ventilated areas; (8) simple, repetitive tasks with simple decision-making; (9) low stress work, defined as work with no strict production quotas or fast pace, such as assembly line work, and only routine work with few changes in the work setting; (10) no contact with the public as part of job duties; (11) occasional contact with coworkers and supervisors, including no teamwork or over-the-shoulder supervision; and (12) no jobs requiring conflict resolution, persuading others, or sales jobs."

Step 4: He is unable to perform any of his past relevant work.

Step 5: He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 46-66).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 65.

## V.   Discussion

Plaintiff contends that the ALJ erred in weighing his treating physicians' opinions and in omitting the restriction to superficial contact.  The Commissioner maintains that substantial evidence supports the ALJ's decision.

### A.   Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ Motta assigned the opinion of Plaintiff's treating hematologist, Dr. Kathula, "partial weight, to the extent of her diagnosis and minimal clinical findings, but no weight to the extent that her opinion purports to establish a condition of disability or greater functional limitations than set forth above." (Doc. #6, *PageID* #63). The ALJ provided two reasons.

The ALJ concluded, "the record does not support Dr. Kathula's statement that [Plaintiff] experienced infections every four to six weeks that lasted between one and two weeks." *Id.* ("nor do her records reflect clinical or objective findings to support her statement that the claimant experiences frequent infections."). She found only one extended episode of pneumonia in early 2016 "but no other significant or extended treatment for 'infections' that could reasonably be expected to cause the degree of symptoms or limitations alleged by [Plaintiff]." *Id.* Further, Dr. Kathula treatment

12

records "are generally remarkable only for [Plaintiff's] allegations of frequent infections." *Id.*

Substantial evidence does not support this reason. Not only does Dr. Kathula document objective symptoms on several occasions in his treatment notes, but Plaintiff's treating family-care physician, Dr. Watson, noted many objective symptoms and clinical findings that strongly support his opinion.

For example, in July 2014, Dr. Kathula noted that Plaintiff had at least three upper-respiratory infections in the previous six months. *Id.* at 1063. One infection lasted almost two months and required two to three courses of antibiotics. *Id.* Because of the frequency of Plaintiff's infections, Dr. Kathula started his IVIG infusions. *Id.*

Dr. Watson's treatment notes document several infections, including one that required two to three courses of antibiotics. Specifically, on March 20, 2014, Dr. Watson noted that Plaintiff had a "[h]arsh raspy rattley cough" during the whole exam. *Id.* at 653. He had purulent (pus) drainage and soft expiratory wheezes. *Id.* She assessed sinobronchitis with pharyngeal involvement and prescribed Augmentin and Tussionex Pennkinetic ER. *Id.* at 653-54. Less than one month later, on April 14, 2014, Dr. Watson noted that Plaintiff had little improvement with antibiotics. *Id.* at 650. She observed, "Injection posterior pharynx still with purulent drainage …." *Id.* On May 1, 2014, Dr. Watson described symptoms of Plaintiff's recurrent respiratory-tract infections: "He coughs harshly, has expiratory wheezes right lung field and anterior lung fields, has course inspiratory crackles/upper airway noises, left: posterior lung field, that seems to

clear intermittently with cough." *Id.* at 647. She prescribed levofloxacin and Tussionex, noting that Augmentin and a Z-pak did not work. *Id.*

Less than three months later, in October 2014, Dr. Kathula noted that Plaintiff had an active upper-respiratory infection, had been coughing thick yellow to gray sputum, and was short of breath upon exertion. *Id.* at 1062. On December 22, 2014, Plaintiff reported to Dr. Kathula that he had three courses of antibiotics in the last two months and was starting a Z-pak that day. *Id.* at 1060. Dr. Watson's notes support Plaintiff's report to Dr. Kathula.

On November 7, 2014, she noted that Plaintiff had sinus congestion, cold, cough, drainage, and throat clearing for a week. *Id.* at 644. He had rare wheezes in his upper anterior lung field, atopy, and bronchospasm. *Id.* Further, she noted "workup and EGD reveal ulcer disease …." *Id.* She also assessed GERD and gastritis. *Id.* She prescribed Levaquin. *Id.* A little less than a month later, on December 4, 2014, Dr. Watson indicated Plaintiff had sinus congestion, moderated HA, and pressure for one week and then felt nauseated. *Id.* at 638. Upon exam, he had sinus tenderness. *Id.* She diagnosed acute maxillary sinusitis and nausea and prescribed Levaquin. *Id.* And, again, on December 19, 2014, Dr. Watson noted recurrent respiratory tract infections with symptoms such as purulent drainage, intermittent cough, and occasional expiratory wheezes. *Id.* at 635. She also diagnosed gastritis. *Id.* She prescribed a Z-pak. *Id.*

In the beginning of 2015, both Dr. Kathula and Dr. Watson documented several infections. For instance, in January 2015, Dr. Watson noted that Plaintiff had a fever, GI distress, nausea followed by vomiting, and diarrhea. *Id.* at 1148. She indicated that the

fever suggested gastroenteritis. *Id.* In February 2015, Dr. Kathula indicated Plaintiff had diarrhea, etiology unknown. *Id.* at 1058-59. He was also having headaches and low-grade fevers. *Id.* at 1058. In March 2015, Dr. Watson noted that Plaintiff was experiencing migraines and acute gastritis. *Id.* at 1145.

Dr. Kathula indicated in July 2015 that Plaintiff had had two upper-respiratory infections since his last appointment (in April 2015). *Id.* at 1054. Dr. Watson's notes support this. On April 15, 2015, Dr. Watson noted Plaintiff had a rash on his hand. *Id.* at 1142. Shortly thereafter, on April 28, 2015, Dr. Watson indicated Plaintiff had acute gastritis and a cold with coughing. *Id.* at 1139. He had expiratory wheezes and copious drainage posterior pharynx. *Id.* She indicated he had sinobronchial syndrome. *Id.* In June 2015, Plaintiff had sinus congestion, cold, and cough for three days. *Id.* at 1136. Dr. Watson noted purulent drainage and course expiratory wheezes. *Id.* She assessed sinobronchitis. *Id.*

In October 2015, Dr. Kathula indicated Plaintiff had bronchitis the month before and was given antibiotics and a steroid injection. *Id.* at 1052. And, one month before, in September 2015, Dr. Watson noted that upon exam, he had "deep injection posterior pharynx with purulent yellow drainage …. Lungs expiratory wheeze R anterior lung field." *Id.* at 1126. Further, "Sinobronchitis with other concerns, pharyngeal involvement, now some degree of laryngitis." *Id.* She diagnosed acute sinusitis and upper respiratory infection. *Id.* She administered an injection of Kenalog and prescribed Tussionex Pennkinetic ER and Augmentin. *Id.*

Dr. Kathula and Dr. Watson's treatment notes also track several infections in the first three months of 2016. On January 7, 2016, Dr. Watson noted that Plaintiff had an upper respiratory infection. *Id.* at 1723. He reported ten days of congestion and cold followed by cough. *Id.* She noted injection posterior pharynx with purulent yellow drainage and expiratory wheezes. *Id.* She prescribed Tussionex and Augmentin. *Id.* On January 11, 2016, Dr. Kathula noted Plaintiff had an upper respiratory infection and was taking Augmentin. *Id.* at 1569. He had a cough with green sputum for weeks and although he started antibiotics four days before his appointment, there was no significant improvement. *Id.* Less than a month later, on February 4, 2016, Plaintiff was short of breath and was coughing and wheezing. *Id.* at 1567. His inhaler was not significantly helping. *Id.* Further, he finished doxycycline a week before without significant improvement. *Id.* Dr. Kathula prescribed a Z-pak and Symbicort inhaler. *Id.* at 1568. About two weeks later, Plaintiff had a persistent cough with green to brown sputum. *Id.* at 1565. Dr. Kathula noted expiratory wheezing in his right upper lobe. *Id.* He had taken three rounds of antibiotics. *Id.* The Symbicort inhaler helped him breath but he still had shortness of breath. *Id.* He also had thrush. *Id.*

Dr. Kathula referred Plaintiff to Gabriel J. Hays, DO at Pulmonary & Critical Care Consultants. *Id.* at 1393. Dr. Hays noted that Plaintiff had eight to ten upper-respiratory infections in the last year. *Id.* at 1394. He diagnoses asthma, asthma attack, and asthma exacerbation. *Id.* at 1393. In March 2016, Dr. Hays noted that Plaintiff was still coughing and had chest discomfort that he called tightness. *Id.* at 1391. By April 2016,

Plaintiff was still coughing and had sinus drainage. *Id.* at 1388. Dr. Hays assessed

pneumonia. *Id.* He performed a bronchoscopy on April 11, 2016. *Id.* at 1495-96.

This evidence strongly supports Dr. Kathula's opinion that Plaintiff had infections

every four to six weeks that can last one to two weeks. Accordingly, substantial evidence

does not support the ALJ's conclusion to the contrary.

The ALJ gave one additional reason for discounting Dr. Kathula's opinion.

"[Plaintiff's] treatment has remained IVIG infusion every four weeks. Dr. Kathula's

records document no other significant treatment for this condition (and claimant denied at

the hearing any other treatment for that condition) …." *Id.* at 63. Plaintiff correctly

points out that the ALJ does not suggest what other treatments would have been

appropriate or available for this condition. Further, although his treatment has been

consistently every four weeks for several years, after Plaintiff's negative reaction to it,

Dr. Kathula extended the time for each treatment to four or five hours. *Id.* at 1256.

Additionally, Plaintiff correctly observes that ALJ Motta referred to Dr. Kathula

as his "treating family physician" rather than acknowledging his specialty in hematology.

This constitutes error. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight

to the medical opinion of a specialist about medical issues related to his or her area of

specialty than to the medical opinion of a source who is not a specialist."). Further, in

ignoring Dr. Kathula's specialty, the ALJ ignores that nature and extent of their treatment

relationship. *See* 20 C.F.R. § 404.1527(c)(2)(ii) (Generally, the more knowledge a

treating source has about your impairment(s) the more weight we will give to the source's

medical opinion…. For example, if your ophthalmologist notices that you have

complained of neck pain during your eye examinations, we will consider his or her

medical opinion with respect to your neck pain, but we will give it less weight than that

of another physician who has treated you for the neck pain.").

Likewise, the ALJ ignores the length of their treatment relationship—over four

years—and frequency of exam—on average, five times per year.  *See* 20 C.F.R. §

404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more

times you have been seen by a treating source, the more weight we will give to the

source's medical opinion.").

In sum, ALJ Motta did not provide good reasons, supported by substantial

evidence, for assigning Dr. Kathula's opinion no weight or partial weight.  "The failure to

provide 'good reasons' for not giving [a treating physician's] opinions controlling weight

hinders a meaningful review of whether the ALJ properly applied the treating-physician

rule that is at the heart of this regulation."  *Gayheart*, 710 F.3d at 377 (citing *Wilson,* 378

F.3d at 544); *see* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[T]he

notice of the determination or decision must contain specific reasons for the weight given

to the treating source's medical opinion ….").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

## B.      Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial

evidence or when the ALJ failed to follow the Administration's own regulations and that

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of
Plaintiff's other challenges to the ALJ's decision is unwarranted.

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and

to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether his application for

Disability Insurance Benefits should be granted.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Edward Mclain was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

August 30, 2019

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).